# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF VIRGINIA

*Newport News Division*

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>    v.<br><br>**RICKY DAMION CHRISTOPHER JONES, JR.,**<br>    (*a/k/a "Top!"*),<br><br>    **Defendant.** | Criminal No. 4:24-cr-18-1 |

## RESPONSE OF THE UNITED STATES TO THE DEFENDANT'S OBJECTIONS TO THE PRESENTENCE REPORT

The United States of America, through its attorneys, Erik S. Siebert, United States Attorney, and Julie D. Podlesni, Assistant United States Attorney, hereby responds opposing the defendant's objections to the application of three enhancements under the United States Sentencing Guidelines (U.S.S.G.) in the Presentence Report [ECF Nos. 130, 181].

***First***, in his Position of the Defendant on Sentencing [ECF No. 184], the defendant objects to the leadership enhancement under U.S.S.G. § 3B1.1(a) imposed at PSR ¶ 34, arguing that he has not been identified as an individual who recruited any co-defendants and has not been shown to have organized five or more individuals because the United States has alleged only that he was responsible for funding the operation. *Id.* at 1–2.

U.S.S.G. § 3B1.1 provides for an enhancement based on the defendant's role in the offense, including a four-level enhancement where the defendant "was an

organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. § 3B1.1(a). In deciding whether a role in the offense enhancement should be applied, the court must consider seven factors:

> [1] the exercise of decision making authority, [2] the nature of participation in the commission of the offense, [3] the recruitment of accomplices, [4] the claimed right to a larger share of the fruits of the crime, [5] the degree of participation in planning or organizing the offense, [6] the nature and scope of the illegal activity, and [7] the degree of control and authority exercised over others.

*United States v. Cameron*, 573 F.3d 179, 184 (4th Cir. 2009) (citing U.S.S.G. § 3B1.1).

As the Statement of Facts makes clear, he has already admitted he "**_directed_** the overall schemes, both robbery and bank fraud, provided the use of his apartment and other financial support and logistics," schemes involving at a minimum the ten co-conspirators[1] identified herein. PSR ¶ 25.29 (emphasis added). As noted in earlier briefing and will be testified to by the agent at sentencing, the defendant was the primary source and recipient of money in connection with the scheme. ECF No. 183 & Ex. B. In fact, he *advertised* his role as the head of the schemes, even choosing the name "Top!" not only for his Telegram handle but for his CashApp display name and his business "Top Snkrz." PSR ¶¶ 25.18, 25.28. *See also* ECF No. 183, 1. Just like the upper-level drug dealer in *United States v. Al-Talib*, 55 F.3d 923, 932 (4th Cir. 1995)

---

[1] The mere number of *specified* co-conspirators – Evans-McCloud, Hurd, Pough, Perry, Ford, Watson, Stukes (PSR ¶¶ 18–24); A.C. (PSR ¶ 25.7(a)); CC-1 and CC-2 (PSR ¶ 26.3) – is sufficient. But the defendant also does not appear to contest the extent or sophistication of the scheme, which is apparent given the complex methods used (encrypted messaging, synthetic identities with stolen Social Security numbers, even extensive directions about how to avoid the attention of police), the number of victims, and the amount of the loss. PSR ¶¶ 16(b), 28–29, 77.

who "acted as a manager . . . supervising the preparation of marijuana for shipment and sending out his inferiors to deliver the drugs," it is of no moment that the defendant used lieutenants or subordinates to organize the individual robberies while still paying for all of the robberies, handling the use and sale of the keys, and taking the lead on the related bank fraud. His actions are much closer to those of the defendant in *United States v. Perkins*, who was "correctly determined [to be] an organizer or leader" where he "directed the activities of other members of the drug ring and facilitated the criminal enterprise by renting apartments, acquiring pagers, hiring a lawyer for a codefendant, and paying for the bond of another codefendant." 108 F.3d 512, 518 (4th Cir. 1997). For the defendant now to contest that precise role – in a statement he made under penalty of perjury – risks attacking the facts in the PSR in a manner inconsistent with acceptance of responsibility.

**_Second_**, the defendant contests the application of the abduction enhancement under U.S.S.G. § 2B3.1(b)(4)(A) to the Hampton robbery in PSR ¶ 64, emphasizing "to another location," as if to imply that such movement did not occur. "Abducted" is defined in the commentary to U.S.S.G. § 1B1.1 as "mean[ing] that a victim was forced to accompany an offender to a different location." U.S.S.G. § 1B1.1 cmt. n.1(A). The required movement is not significant: the victim "need not have been moved any great distance" and "the abduction enhancement may properly be applied even though the victim remained within the confines of a single building." *United States v. Osborne*, 514 F.3d 377, 389 (4th Cir. 2008). The United States Supreme Court further clarified the term by observing that while the requisite accompaniment "does not embrace

minimal movement—for example, the movement of a bank teller's feet when the robber grabs her arm" neither does it require movement across "large distances"; instead, it need only "constitute movement that would normally be described as from one place to another, even if only from one spot within a room or outdoors to a different one." *Whitfield v. United States*, 574 U.S. 265, 266, 268 (2015) (upholding the application of the enhancement to a defendant who "guided [the victim] from the hallway to a computer room" that he described as "between four and nine feet away.") It also does not need to be permanent: "even a temporary abduction can constitute an abduction for purposes of the sentencing guidelines." *United States v. Nale*, 101 F.3d 1000, 1003 (4th Cir. 1996).

Again, the Statement of Facts makes clear that after Evans-McCloud had pointed the gun at the carrier's head "[s]he agreed to give it to him but told him it was in her mail truck. Evans-McCloud ***walked the victim carrier back to the mail truck*** while pressing the gun into her back." PSR ¶ 25.15(c) (emphasis added). That movement was much more than any "minimal movement" that happened when he put the gun in her back: the facts do not describe such a movement, that she "swayed" or "stepped." Rather they note that *both* she and Evans-McCloud had to "walk"[2] back

---

[2] Defined, as is relevant here, as "to move along on foot: advance by steps," having its origin in the Middle English *walken*, meaning "to roll, toss about (of the sea, waves), wander, journey, go, go on foot, stroll, move about on earth (of a dead person's spirit), be in motion, circulate, be present, live," largely implying movements over significant distances, just as the verbal noun "a walk" ("an act or instance of going on foot especially for exercise or pleasure") implies moving for the sake of covering distance. *See* "Walk." *Merriam-Webster.com Dictionary*, https://www.merriam-webster.com/dictionary/walk. Accessed 19 Mar. 2025. Even the definition of the phrasal verb to "walk [something] back" – "to retreat from or distance oneself from (a

to the truck from another place that was a significant enough distance away that (1) the victim carrier could not immediately access it when he demanded it – she did not "turn" or "reach into" the truck but rather "walked back" – and (2) Evans-McCloud did not feel he could adequately control her movements by keeping the gun pointed at her but instead felt the need to press the gun to her back and walk with her to keep her under control. The victim here did not move because Evans-McCloud jostled her arm but because he deliberately moved the victim just as described in *Whitfield* – "from one spot . . . outdoors to a different one" – by "walk[ing her] back to the mail truck," compelling both her movement and submission by keeping a gun in her back, an act which more than meets the criteria for the abduction enhancement.

As a final note and as the United States outlined when offering the plea, even if the Court were to find that the enhancement under U.S.S.G. § 2B3.1(b)(4)(A) does not apply, that does not mean there is no enhancement, but rather that the two-level increase for restraint of victim under U.S.S.G. § 3A1.3 would come into effect, having previously been barred because the abduction enhancement "specifically incorporate[d] this factor." U.S.S.G. § 3A1.3, cmt. n.2.[3]

---

previously stated opinion or position)" – explicitly incorporates the idea of distance between two points. *See* "Walk back" *Merriam-Webster.com Dictionary*, https://www.merriam-webster.com/dictionary/walk%20back. Accessed 19 Mar. 2025.

[3] U.S.S.G. § 3A1.3 defines physical restraint as the forcible restraint of a victim, such as being tied, bound, or locked up. U.S.S.G. § 1B1.1, cmt. n.1(L). The definition's "use of words 'such as' [make it] apparent that 'being tied, bound or locked up' are listed by way of example rather than limitation." *United States v. Stokley*, 881 F.2d 114, 116 (4th Cir. 1989) (internal citation omitted). The United States Court of Appeals for the Fourth Circuit has repeatedly held that controlling someone's movement by pointing a gun at them constitutes physical restraint. *See, e.g., United States v. Wilson*, 198 F.3d 467, 472 (4th Cir. 1999) (upholding finding of physical restraint

***Third***, the defendant objects to the brandishing enhancement under U.S.S.G. § 2B3.1(b)(2)(C) applied throughout because he "was not charged with" and "did not plead guilty to brandishing a firearm" and because he "did not provide the firearm and did not have a firearm." ECF No. 184, 2. But those calculations are not made based solely on the defendant's own conduct but also all "relevant conduct," as set forth in § 1B1.3:

> (1) (A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant; and
>
> (B) in the case of a jointly undertaken criminal activity (a criminal plan, scheme, endeavor, or enterprise undertaken by the defendant in concert with others, whether or not charged as a conspiracy), all acts and omissions of others that were—
>
> (i) within the scope of the jointly undertaken criminal activity,
>
> (ii) in furtherance of that criminal activity, and
>
> (iii) reasonably foreseeable in connection with that criminal activity;
>
> that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense;
>
> [. . .]
>
> (3) all harm that resulted from the acts and omissions specified in subsections (a)(1) and (a)(2) above, and all harm that was the object of such acts and omissions; and

---

where victim was held at gunpoint and was unable to leave her car while she was carjacked); *United States v. Baylor*, 296 F. App'x 360, 362 (4th Cir. 2008) (no error in applying physical restraint enhancement where a co-defendant held a victim at gunpoint during a robbery).

-6-

    (4)  any other information specified in the applicable guideline

Harmonizing the enhancement and the relevant conduct guideline, the Fourth Circuit has articulated the test for the application of the enhancement as: whether the firearm occurred within the scope of the joint criminal activity, furthered it, and was reasonably foreseeable. *United States v. Mays*, 676 F. App'x 192, 193 (4th Cir. 2017). *See also*, *United States v. Kearney*, 8 F. App'x 247, 249 (4th Cir. 2001) (test is whether the defendant knew that his co-conspirator was carrying a gun in furtherance of their jointly undertaken criminal activity).

    In this case, there were numerous indicia that the co-conspirators would brandish a gun in furtherance of the robberies and of the defendant's enthusiastic consent to the same. Most obviously, the defendant cannot argue that it was not reasonably foreseeable to him that they would brandish a gun when he was the very first member of the conspiracy to bring up brandishing a gun ("pole em up") in detail with "Woo" in the Telegram chat when discussing the particular level of force needed to effectuate the robbery, then goes on to *direct* Ford "don't even gotta shoot the mailman jus gotta pole em up." PSR ¶¶ 25.20–.22. And that involvement with the firearms did not end there, as there are obvious indicators of his continuing involvement, such as sending his codefendant money for a gun ("pole") PSR ¶ 26.7. Finally, firearms were brandished in all six of the robberies, and Ford sent a picture immediately after the Norfolk robbery showing the gun right next to the arrow key and badge, just as he did when sending a picture showing himself holding a gun over the items related to the fraud. PSR¶¶ 25.24, 26.8. It strains credulity to argue that a

defendant making those kinds of statements, funding those kinds of purchases, and receiving those kinds of images would not find the use of a firearm in these robberies foreseeable.

## CONCLUSION

The defendant's objections are without merit, and the Court should overrule them.

Respectfully submitted,

Erik S. Siebert
United States Attorney

By: /s/
Julie D. Podlesni (VSB #77198)
Assistant United States Attorney
Office of the United States Attorney
11815 Fountain Way, Suite 200
Newport News, Virginia 23606
Tel. (757) 591-4000 | Fax (757) 591-0866
Julie.Podlesni@usdoj.gov

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 20th day of March, 2025, I filed a copy of the foregoing with the Clerk of Court via CM/ECF, which will send a notification to counsel.

/s/
Julie D. Podlesni
Assistant United States Attorney